UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA

v.

COLT MEADOWS

Criminal No. 3:26CR 81( )( )

VIOLATIONS:

18 U.S.C. § 1962(d) (Racketeering
Conspiracy)

18 U.S.C. § 1349 (Conspiracy to Commit
Wire Fraud)

INFORMATION

The United States Attorney charges:

COUNT ONE
(Racketeering Conspiracy)

MAY 5 2026 PM5:05
FILED-USDC-CT-HARTFORD

The Enterprise

1.      At all times relevant to this Information, the defendant, COLT MEADOWS, and others known and unknown to the United States Attorney, were members and associates of a New Haven, Connecticut street gang known as "Stand on Business" or "SOB," (referred to herein as the "Enterprise"), a criminal organization whose members and associates engaged in, among other activities, narcotics distribution and acts of violence, including murders and assaults.

2.      The SOB gang began as a street gang based in the geographic area of New Haven known as the "Hill" in the southwestern-most neighborhood of New Haven, but, in addition to the Hill, it has members and associates who either are incarcerated or living throughout the City of New Haven and other towns in Connecticut. SOB members and associates often communicate through various forms of electronic communication, including Facebook messenger, Snapchat,

1

Instagram, phone calls, text messages, rap songs and music videos posted online. At times, members and associates use gang symbols and code words to communicate in order to avoid revealing their criminal activity.

3. Members and associates of the SOB gang are expected to protect the name, reputation, and status of the gang from rival gang members and other persons. To protect the gang and enhance its reputation, members and associates are expected to use any means necessary to force respect from those who have shown disrespect, including by committing acts of intimidation, threats of violence, and acts of violence.

4. The SOB gang has long-standing issues with other neighborhood gangs within the City of New Haven, specifically gang members from within the "Exit 8" gang, based in the geographic area accessed by exiting Interstate 91 at Exit 8 in New Haven, as well as with other neighborhood gangs. Violence between these groups is retaliatory in nature, and members of SOB are believed to be responsible for a number of non-fatal and fatal shootings in the Exit 8 section and other areas of New Haven.

5. The SOB gang had multiple criminal objectives, one of which was enrichment of the members and associates of the Enterprise through the distribution of controlled substances, including fentanyl, heroin, cocaine base ("crack"), marijuana, and Percocet pills. SOB gang members and associates engaged in narcotics trafficking together. They shared customers and referred each other to customers. Often, drug related activity was coordinated and facilitated by text messaging and Facebook messenger.

6. Members and associates of the SOB gang committed, conspired, attempted, and threatened to commit acts of violence to protect the Enterprise and to protect fellow members and

associates of the SOB gang as well as the reputation of deceased members. These acts of violence included acts of murder and assault intended to protect the SOB gang from rival gangs and to otherwise promote the standing and reputation of the Enterprise amongst rival gangs as well as amongst other SOB gang members.

7.    At all times relevant to this Information, the SOB gang, including its leaders, members, and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The SOB gang or Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

<u>The Racketeering Conspiracy</u>

8.    From in or around 2018 through in or around July 2025, both dates being approximate and inclusive, within the District of Connecticut and elsewhere, the defendant, COLT MEADOWS, together with others known and unknown, each being a person employed by and associated with "Stand on Business" or "SOB," an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with one another to violate Title 18, United States Code, Section 1962(c); that is, to conduct and participate directly and indirectly in the conduct of the affairs of said enterprise through a pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and (5), consisting of multiple:

      a.   acts involving murder, chargeable under Connecticut General Statutes, Sections 53a-54a (murder), 53a-8(a) (aiding and abetting), 53a-48 (conspiracy), and 53a-

49 (attempt);

    b.  acts indictable under Title 18, United States Code, Section 933 (relating to trafficking in firearms); and

    c.  offenses involving trafficking in controlled substances, in violation of Title 21, United States Code, Sections 841 and 846.

9.     It was further part of the conspiracy that the defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

All in violation of Title 18, United States Code, Section 1962(d).

COUNT TWO
(Conspiracy to Commit Wire Fraud)

Background

10.     From in or around 2023 and continuing through in or around July 2025, in the District of Connecticut and elsewhere, the defendant, COLT MEADOWS, knowingly and with the specific intent to defraud, did combine, conspire, confederate, and agree with others known and unknown to the Grand Jury to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

11.     The object and purpose of the conspiracy and scheme was for MEADOWS and his coconspirators to enrich themselves by knowingly devising and intending to devise a scheme to defraud automobile insurance providers, such as Geico, State Farm and Allstate, and to obtain money in the form of automobile insurance claim payments by means of materially false and fraudulent pretenses, representations, and promises, and to use interstate wires in execution of that scheme.

12.     It was part of the conspiracy, scheme, and artifice to defraud that MEADOWS and his co-conspirators obtained the identities of car owners and vehicle identification numbers

4

("VINs") by communicating over Facebook messenger or text message with unwitting sellers of used cars, whom MEADOWS or his co-conspirators requested to provide photographs of the VIN stickers on the interior of the used cars. MEADOWS and his co-conspirators also obtained automobile insurance policy information by breaking into parked vehicles and stealing car insurance paperwork from the cars and through other means, such as, through witting and unwitting third-parties. MEADOWS and his co-conspirators then exchanged and shared the fraudulently obtained VIN and insurance information via phone communications, including text messages and communications via mobile applications, such as Telegram, Facebook messenger, and WhatsApp, in order to electronically submit false automobile insurance claims to the insurance companies using stolen or false identities, stolen VIN numbers, and stolen policy numbers.

13.    It was further part of the conspiracy, scheme, and artifice to defraud that MEADOWS made materially false representations to automobile insurance providers including, but not limited to: (a) falsely representing himself to be a claimant, using stolen or false identification information; (b) falsely representing that the claimant had been involved in a car accident; (c) falsely claiming that the other insured party had been involved in the same car accident; and (d) falsely claiming that the claimant had suffered damages to his or her vehicle as a result of the fictitious car accident, therefore requiring insurance payouts to cover the costs of repair to the claimant's vehicle.

14.    It was further part of the conspiracy, scheme, and artifice to defraud that MEADOWS provided the automobile insurance companies with bank account information in order to obtain insurance payouts, which MEADOWS shared with co-conspirators and used for personal expenditures. The insurance providers then wired payment to those bank accounts and

5

provided confirmation via text and email to MEADOWS and other co-conspirators.

15.     For example, on or about August 27, 2024, MEADOWS sent a Facebook message to Victim 1, who was selling a 2021 Audi A7 Series on Facebook Marketplace. MEADOWS, purporting to be interested in purchasing the 2021 Audi A7, requested that Victim 1 send a photograph of the VIN to see if the vehicle had been in any accidents. Victim 1 sent the photograph of the VIN to MEADOWS and advised that the title of the car was in Victim 1's husband's name. MEADOWS then filed an accident claim with Geico under Victim 1's husband's name as the claimant, using the VIN fraudulently obtained from Victim 1, and provided a false address, in order to obtain an insurance payout. On or about August 29, 2024, Geico sent electronic confirmation of a digital transfer payment of $7,889.72 for the false claim to MEADOWS, who shared the confirmation via text message with a co-conspirator.

All in violation of Title 18, United States Code, Section 1349.

UNITED STATES OF AMERICA

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

STEPHANIE T. LEVICK
ASSISTANT UNITED STATES ATTORNEY

NATHAN GUEVREMONT
ASSISTANT UNITED STATES ATTORNEY

6